# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA MADE HOCKEY, INC., | Civil No. 10-3884 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| MINNESOTA HOCKEY, INC.; DISTRICT OF MINNESOTA AMATEUR HOCKEY, ASSOCIATION, DISTRICT 6 OF MINNESOTA AMATEUR HOCKEY ASSOCIATION; BLOOMINGTON JEFFERSON HOCKEY BOOSTER CLUB; BLOOMINGTON KENNEDY HOCKEY ASSOCIATION; BLOOMINGTON YOUTH HOCKEY ASSOCIATION; BURNSVILLE HOCKEY CLUB; CHASKA CHANHASSEN HOCKEY ASSOCIATION; EDEN HOCKEY ASSOCIATION; EDEN PRAIRIE HOCKEY ASSOCIATION; MINNETONKA YOUTH HOCKEY ASSOCIATION; NEW PRAGUE HOCKEY ASSOCIATION, INC.; PRIOR LAKE/SAVAGE HOCKEY ASSOCIATION; RICHFIELD HOCKEY AUXILIARY; SHAKOPEE YOUTH HOCKEY ASSOCIATION; WACONIA HOCKEY ASSOCIATION, INC.; BRAD HEWITT; ABC CORPORATION; and JOHN DOE, | **MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION** |
| Defendants. | |

Jason E. Engkjer, Jenna T. Burfeind and Michael C. Glover, **KALINA WILLS GISVOLD & CLARK, PLLP,** 6160 Summit Drive, Suite 560, Minneapolis, MN 55430, for plaintiff.

Robert L. DeMay and Andrew Davis, **LEONARD STREET AND DEINARD, PA,** 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, for defendants District 6 of Minnesota Amateur Hockey Association, Bloomington Jefferson Hockey Booster Club, Bloomington Kennedy

Hockey Association, Bloomington Youth Hockey Association, Burnsville Hockey Club, Chaska Chanhassen Hockey Association, Eden Prairie Hockey Association, Eden Hockey Association; Minnetonka Youth Hockey Association, New Prague Hockey Association, Richfield Hockey Auxiliary, Shakopee Youth Hockey Association, Waconia Hockey Association and Brad Hewitt.

Janine M. Luhtala, Jonathan C. Marquet and Mark R. Whitmore, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN 55402, for defendant Prior Lake/Savage Hockey Association.

In July 2010, defendant District 6 of Minnesota Hockey, Inc. adopted a rule barring its players from participating in another hockey league while playing for a District 6 team. Plaintiff Minnesota Made Hockey, Inc. offers league play opportunities to youth who play in District 6 and brought this motion for a preliminary injunction to enjoin District 6 and the other defendants from enforcing the rule. Although the Court finds that Minnesota Made Hockey has shown a likelihood of success on it anti-trust monopolization claims, the Court denies the preliminary injunction motion because the plaintiff has not shown irreparable harm, an essential requirement for injunctive relief.

## BACKGROUND

All amateur sports in which the United States competes internationally are organized under a cascading system of regulation – the head of this system is the United States Olympic Committee ("USOC"). Each sport is governed by a National Governing Body ("NGB"). Congress authorized this structure when it passed the Amateur Sports Act ("ASA") in 1978. 36 U.S.C. §§ 220501 *et seq.* Congress' purpose for the structure and oversight of amateur sports as governed by the ASA included:

(1) to establish national goals for amateur athletic activities and encourage the attainment of those goals;

(2) to coordinate and develop amateur athletic activity in the United States, directly related to international amateur athletic competition, to foster productive working relationships among sports-related organizations;

...

(6) to promote and encourage physical fitness and public participation in amateur athletic activities;

(7) to assist organizations and persons concerned with sports in the development of amateur athletic programs for amateur athletes . . . .

36 U.S.C. § 220503.

The NGB for each sport must be a non-profit entity that demonstrates "autonom[y] in the governance of its sport." 36 U.S.C. § 220522(a)(1), (5). Circuit courts have determined that the autonomy required in the statute allows an NGB "the monolithic control of an amateur sport by the NGB for that sport . . . ." *Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 529 (10th Cir. 1989); *see also JES Props., Inc. v. USA Equestrian, Inc.,* 458 F.3d 1224, 1231 (11th Cir. 2006), *cert. denied*, 549 U.S. 1205 (2007); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.,* 213 F.3d 198, 204 (5th Cir. 2000).

The NGB for hockey is USA Hockey. Amateur hockey in Minnesota is controlled by USA Hockey-affiliate Minnesota Hockey. Minnesota Hockey is further divided into thirteen geographic district associations.[1] District 6 controls the South and West metro areas of the Twin Cities, and is itself a cooperative group of thirteen independent youth

---

[1] There are 13 districts, numbered 1 through 16 with no district 7, 13, or 14.

hockey associations. Brad Hewitt is the director of District 6. Minnesota Hockey, District 6, District 6 Director Brad Hewitt, and the cooperative associations organized under District 6 are, collectively, "defendants" in this litigation.

Plaintiff Minnesota Made Hockey operates a for-profit hockey program in the same geographic area as District 6. Plaintiff offers a variety of youth hockey programming services including skate training, speed training, stick handling, passing and shooting, checking, offensive/defensive strategies, team training, and league and tournament team services. Plaintiff owns its own hockey rink in Edina and regularly rents ice time at a rink in Burnsville to conduct this business. These rinks are also in the geographic area of District 6. As a result, plaintiff and defendants provide similar services to the same population. Particularly at issue in this litigation are their league-play offerings.

In July of 2010, District 6 adopted a rule ("the outside league rule"):

> A player registered with [District 6] may not register or play hockey with any other organization, association or team during the winter hockey season, including playoffs. If a player is found to be registered or playing with another team, the District Director will determine, in their sole discretion, what sanction shall be assessed which may include, without limitation, suspension for the remainder of the District 6 winter hockey season, including playoffs. This rule does not impact any hockey clinics or outside activities including but not limited to Boy Scouts, Girl Scouts, Religious events, birthday parties, etc. This rule strictly applies to league play.

(First McBain Aff. ¶ 33, Sept. 10, 2010, Docket No. 6.) Several of the for-profit hockey operations in District 6's area sought clarification about whether players could participate in their programs without being sanctioned. For example, Joe Dziedzic, a former

professional hockey player, operates a program that includes a winter 3-on-3 league that District 6 subsequently exempted from the outside league rule.[2]

Several players and coaches have left plaintiff's programs citing the outside league rule. Many of the departing players had already made substantial deposits for plaintiff's programming. Plaintiff seeks a preliminary injunction to enjoin enforcement of the rule alleging tortious interference with prospective business relations; tortious interference with existing contractual relations; violations of Minn. Stat. §§ 325D.51 & D.52 (Minnesota's anti-trust statutes); and violations of 15 U.S.C. §§ 1 & 2 (federal anti-trust statutes or the "Sherman Act").

## ANAYLSIS

### I.    Standard of Review

In determining whether a party is entitled to preliminary injunctive relief, the Court considers "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant; (3) the probability that [the] movant will succeed on the merits; and (4) the public interest." *Dataphase Sys., Inc. v. CL Sys., Inc.,* 640 F.2d 109, 113 (8th Cir. 1981). "The question is whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Id.* "It frequently is observed that a preliminary injunction is an extraordinary and drastic

---

[2] 3-on-3 Skills Night, Joe Dziedzic Hockey, http://www.jdhockey.com/page/show/35004 (last visited Oct. 3, 2010) ("This is not a 'league.' **District 6 has approved this program.**")

remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (emphasis omitted).

## II.     Irreparable Harm

To succeed in an action for a preliminary injunction, a movant must first show irreparable harm that is **not** compensable with money damages. *Travel Tags, Inc. v. UV Color, Inc*., 690 F. Supp. 2d 785, 798 (D. Minn. 2010). Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages. *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009). Loss of reputation can be irreparable harm. *See Med. Shoppe Int'l, Inc. v. S.B.S. Pill Dr., Inc.,* 336 F.3d 801, 805 (8th Cir. 2003) (loss of intangible assets such as reputation and goodwill constitute irreparable injury even though they are difficult to quantify); *Iowa Utils. Bd. v. Fed. Commc'ns Comm'n,* 109 F.3d 418, 426 (8th Cir. 1996) (loss of consumer goodwill can be irreparable harm).

Plaintiff alleges the loss of current customers, as well as the loss of reputation and consumer goodwill, as a result of District 6's outside league rule. Defendants contend that a preliminary injunction is not necessary since their own internal grievance policy is so prolonged that a player would likely not face discipline for violation of the rule during the hockey season.

The Court finds that plaintiff's request for a preliminary injunction fails to demonstrate irreparable harm for several reasons. First, the loss of players from one season of play is a calculable financial loss. Second, the fact that plaintiff has filed this

lawsuit is likely known to those players who have chosen to leave plaintiff's leagues, or can be communicated to them, so as to preserve the players as potential customers in the next season. Third, the slow-moving grievance policy means that no individual player is likely to lose eligibility to play in District 6 during the coming season. As a result, the Court does not find that the type of harm demonstrated by plaintiff warrants the "extraordinary and drastic remedy" of a preliminary injunction. *Mazurek*, 520 U.S. at 972.

### III.      Balance Between the Parties

Defendants argue that a preliminary injunction would "force Minnesota Hockey to not only live with, but to participate in, the physical taxing of youth hockey players . . . ." (Defs.' Mem. in Opp'n. at 19, Docket No. 14.) However, defendants also negotiated for other "physically taxing" hockey programs to be exempted from the rule, undermining this argument. Further, since defendants admit enforcement of the rule will occur so slowly as to have little impact, it is not clear that enjoining the rule would have any impact on defendants. Consequently, the Court finds that plaintiff has demonstrated greater harm will flow from the existence of the rule than would flow from its enjoinment.

### IV.      Probability of Success on the Merits

In evaluating the "probability of success on the merits," the Court need not discern with mathematical precision, whether the plaintiff has a greater than fifty percent chance of prevailing. *Dataphase*, 640 F.2d at 113.

The equitable nature of the proceeding mandates that the court's approach be flexible enough to encompass the particular circumstances of each case. Thus, an effort to apply the probability language to all cases with mathematical precision is misplaced. . . . [W]here the movant has raised a substantial question [as to irreparable harm] and the equities are otherwise strongly in his favor, the showing of success on the merits can be less. . . . [W]here the balance of other factors tips decidedly toward plaintiff a preliminary injunction may issue if movant has raised questions so serious and difficult as to call for more deliberate investigation.

*Id.* (footnotes omitted). Further, the plaintiff need not demonstrate a probability of success on each claim. *See e.g.*, *Anheuser-Busch, Inc. v. VIP Products, LLC*, 666 F. Supp. 2d 974, 981-82 (E.D. Mo. 2008).

### A. Anti-trust claims

Plaintiff alleges federal and state anti-trust violations.[3] As an initial matter, defendants allege they are exempt from anti-trust laws given their status as non-profit entities, and given the expressed Congressional intent that NGBs have "monolithic" control over their sport. *See Behagen*, 884 F.2d at 529. The Fifth, Tenth, and Eleventh Circuits have found implied immunity arising from the ASA for the NGB of a sport. *Eleven Line, Inc.*, 213 F.3d at 204; *Behagen*, 884 F.2d at 529; *JES Props., Inc.*, 458 F.3d at 1231-32. Given the reluctance to find exemption from anti-trust laws absent clear intent, however, courts have held that when it is the **state association**, not the NGB, that promulgates a rule, exemption does not follow. *JES Props., Inc.,* 458 F.3d at 1230 ("[I]f the national state associations all over the country had a similar rule, one could infer that

---

[3] Courts have interpreted the Minnesota anti-trust statutes as analogous to federal claims. *See, e.g.*, *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 557 (Minn. Ct. App. 2001).

the rule was necessary to the management of the sport." (internal citations omitted)); *see also Eleven Line, Inc.*, 213 F.3d at 204. Here, one local district of one NGB has promulgated a rule, "suggest[ing] that the rule is not necessary to the local management of amateur [hockey]." *Eleven Line, Inc.*, 213 F.3d at 204. In accord with courts that have found no exemption when only one **state** association has adopted a rule, this Court finds no exemption from anti-trust liability when one **local** association has adopted a rule for only their players. *Id.*

Second, defendants argue that plaintiff cannot meet the threshold requirements of the Sherman Act of anti-trust injury and anti-trust standing. *See In re Canadian Imp. Antitrust Litig.*, 470 F.3d 785, 791 (8th Cir. 2006) (requiring a showing of both antitrust injury and standing under antitrust laws). The essence of defendants' arguments on these points seems to be that there was no competition before the rule, since most players could participate in both leagues, so the outside league rule has now improved the competitive market for hockey services, and as a result more players will choose plaintiff since plaintiff will allow those players to play elsewhere. This argument is both circular and speculative. The existence of injury is addressed above. The outside league rule changed the market in a manner antithetical to competition and an argument that the rule will improve plaintiff's business prospects runs counter to the record. Further, such a determination requires the type of speculation not appropriate for consideration of a preliminary injunction motion. *See Goff v. Harper*, 60 F.3d 518, 521 (8th Cir. 1995). The Court thus finds that plaintiff has both injury and standing to bring an anti-trust claim.

## 1.     15 U.S.C. § 1: Conspiracy

To establish a claim under Section 1 of the Sherman Act a plaintiff must demonstrate (1) that there was a contract, combination, or conspiracy; (2) that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis; and (3) that the restraint affected interstate commerce. *Insignia Sys., Inc. v. News Am. Mtkg. In-Store, Inc.*, 661 F. Supp. 2d 1039, 1062 (D. Minn. 2009).

On the first element, the plaintiff must demonstrate concerted, as opposed to unilateral, action. *Willman v. Heartland Hosp. E.,* 34 F.3d 605, 610 (8th Cir. 1994). Defendants argue that, despite the number of cooperatives that comprise District 6, it should benefit from a "single economic entity" designation as defined by the Supreme Court. Under that analysis

> it is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police. The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).

However, "[m]any . . . courts have resisted single entity arguments involving sports industries." *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 836 (3d Cir. 2010); *see id.* at 836 n.14 (discussing cases). Given the conclusion that the ASA does not automatically exempt a state association from anti-trust liability, even if such an exemption exists for the NGB, it is not clear that local associations are exempt from § 1's conspiracy proscription. *See Eleven Line, Inc.*, 213 F.3d at 204.

Plaintiff asserts that the enforcement of the outside league rule by the different cooperative associations comprising District 6 rises to the level of concerted action, but plaintiff does not address the "single economic entity" issue as defined by the Supreme Court. *Copperweld*, 467 U.S. at 769. A review of Minnesota Hockey's by-laws that are a part of the record makes clear that each team within a district operates under the direction of the District Director. For example, the bylaws allow a district to establish a "district board" but maintain that "if they exist, [they] shall operate as an adjunct part of [the state NGB]." (Minnesota Hockey Handbook at 25, Hewitt Aff. Ex B, Docket No. 16.). Additionally, the different associations do not "compete" for players for their teams within a district; rather players are assigned based on their residence and can only switch teams through a waiver procedure. (*Id.* at 27.) These operating procedures lead the Court to conclude that plaintiff's conspiracy claim will likely not succeed on the merits, as defendants appear to be more appropriately deemed a single economic actor. Therefore, the outside league rule is likely a unilateral action. It is thus unnecessary, at this stage, for the Court to evaluate the remaining elements of a conspiracy claim.

### 2. 15 U.S.C. § 2: Monopolization

To succeed on a claim of monopolization under Section 2 of the Sherman Act, "plaintiff [must] plead and prove that . . . defendant[s] (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining it as a result of a superior product, business acumen, or historical accident." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998)

(internal quotation marks omitted). In assessing a monopolization claim, the Court must first define the relevant market. *Id.*

### a. Market

"The definition of the relevant market [for an anti-trust claim] has two components – a product market and a geographic market." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995). The determination of the relevant market is a fact driven analysis where "[t]he question is just where these parties met in the [relevant] market." *Crown Zellerbach Corp. v. F.T.C.*, 296 F.2d 800, 804 (9th Cir. 1961). Here, the Court finds the relevant product market to be "league-play programming." While plaintiff offers a number of services related to youth hockey, the parties' programming overlaps in the area of league play. The evidence of players in both leagues is a "meeting of the parties," thus giving definition to the market. Further, given the demands of family and school, youth hockey is also limited in geographic scope by the ability of parents to drive their players to practices and games, thus roughly establishing the geographic market at issue. *See Bathke*, 64 F.3d at 345 ("The proper definition of a geographic market is determined by a factual inquiry into the commercial realities faced by consumers." (internal quotations and citations omitted)). Therefore, the Court finds that the relevant market is youth league hockey programming in the South and West Twin Cities metro area.

### b.     Market Power

"Monopoly power is the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). A plaintiff may establish monopoly power by "showing . . . **the actual exclusion of competitors**." *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979) (emphasis added); *Insignia Sys., Inc.*, 661 F. Supp. 2d at 1057. Here, the rule explicitly states that players may not play in outside leagues and players are citing the rule as the reason for their defection from plaintiff's programs. (*E.g.*, E-mail from Charlie Pizel, First McBain Aff. Ex. F, Docket No. 6-1). This evidence sufficiently demonstrates defendants' market power to exclude competition.

### c.     Maintenance of Market Power

The final step of a Section 2 analysis is a showing that defendants have maintained their market power through anti-competitive means as opposed to gaining that power as a result "of a superior product, business acumen, or historical accident." *Double D Spotting Serv., Inc.*, 136 F.3d at 560 (internal quotation marks omitted). "[M]ere possession of monopoly power is not illegal. . . . However, if a monopolist abuses its monopoly power and acts in an unreasonably exclusionary manner vis-a-vis rivals or potential rivals, then § 2 is violated." *Byars*, 609 F.2d at 850. The exclusivity requirement of the outside league rule, coupled with the exemption of certain other leagues and activities, is adequate to demonstrate a probability of success on this element for the purposes of a preliminary injunction. *See id.*

In sum, plaintiff has proven the existence of a relevant product and geographic market, the power of defendants over that market, and their maintenance of that power through anti-competitive means. Therefore, the Court finds that plaintiff has demonstrated a likelihood of success on the merits of its § 2 monopolization claim.

### 3.      15 U.S.C. § 2: Attempted Monopolization

To establish that defendants attempted to create a monopoly under Section 2 of the Sherman Act, plaintiff needs to prove that defendants (1) specifically intended to control prices or destroy competition in some part of commerce; (2) engaged in predatory or anti-competitive conduct directed to accomplishing the unlawful purpose; and (3) had a dangerous probability of success. *Trace X Chemical v. Can. Indus.*, 738 F.2d 261, 265 (8th Cir. 1984). Specific intent can be shown through inference. *Gen. Indus. Corp. v. Hartz Mountain Corp.*, 810 F.2d 795, 802 (8th Cir. 1987).

As to the first prong, plaintiff provides circumstantial evidence of intent to monopolize — the rule itself expressly prohibiting players from participating in other leagues and the minutes of the meetings where specific competitors are named in reference to the rule. (Meeting Minutes, First McBain Aff. Exs. A–D, Docket No. 6.) Plaintiff also provides direct evidence that Hewitt stated he wanted to block players from going to other leagues. (Cobb Aff. ¶7, Docket No 23 ("Mr. Hewitt discussed concerns regarding the prospective development of winter hockey season [league play] by

[plaintiff].  I recall that Mr. Hewitt stated that [defendants] ha[ve] to 'stop [plaintiff]' from 'taking our kids' . . . .").)[4]

Regarding the second prong, "[a]nticompetitive conduct is conduct without legitimate business purpose that makes sense only because it eliminates competition. When a valid business reason exists for the conduct alleged to be predatory or anti-competitive, that conduct cannot support the inference of a Sherman Act violation." *HDC Med., Inc. v. Minntech Corp.*, 474 F.3d 543, 549–50 (8th Cir. 2007) (alteration omitted) (internal quotation marks and citation omitted).  The outside league rule expressly prohibits players from purchasing services from a competitor.  Defendants assert that minimizing scheduling conflicts and promoting player well-being are valid justifications for the rule.  However, since they exempted other potentially conflicting and physically taxing programs from the rule, the Court finds that the inference of an anti-trust violation is not overcome.

Regarding the third prong, a dangerous probability of success is evidenced by the actual defection of players citing the rule.  (*See* E-mails, First McBain Aff., Exs. G–K, Docket No. 6.)  In sum, the Court finds that plaintiff has demonstrated a likelihood of success on the merits of its claim of attempted monopolization.

---

[4] Defendants moved to strike the Cobb Affidavit and the Second McBain Affidavit because they were not timely submitted.  Given the time constraints and discovery limitations involved in pursuing an early preliminary injunction and the presence of other evidence supporting the evidence submitted in the affidavits, the Court will deny the motion to strike.

### 4. Conspiracy to Monopolize

Plaintiff alleges conspiracy to monopolize and it is unclear to the Court how this charge is different from the conspiracy to monopolize under 15 U.S.C. § 1. Regardless, this claim is likely to fail for lack of concerted action.

### B. State Claims

Defendants argue that the state claims asserted in plaintiff's motion are preempted by federal law. Courts have held that the legislative history of the ASA indicates that Congress did not intend to provide **individual athletes** a private cause of action. *Lee v. U.S. Taekwondo Union*, 331 F. Supp. 2d 1252, 1256 (D. Haw. 2004) (emphasis added). Since this case does not involve an individual athlete, the Court finds that plaintiff's state law claims are not preempted.

### 1. Tortious interference with prospective business relationships

Tortious interference with prospective business relationships involves the intentional and improper (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (2) preventing the other from acquiring or continuing the prospective relation. *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn. 1982). Discouraging prospective customers can constitute such interference. *Golden Valley Lutheran Coll. v. City of Golden Valley*, No. CO-91-1189, 1991 WL 263472, at *3 (Minn. Ct. App. Dec. 17, 1991) (noting that evidence that a city manager verbally discouraged potential buyers of real estate was adequate to survive dismissal for failure to state a claim). Plaintiff must establish that the interference actually caused the

third person to not enter into the prospective relation. *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 96 (Minn. Ct. App. 1991).

Here, plaintiff presents sufficient evidence of interference. Plaintiff notes that of thirteen players registered in one league, all but one dropped out since the District 6 rule was promulgated. (Second McBain Aff. ¶ 4, Sept. 30, 2010, Docket No. 22; *see, e.g.*, E-mail from Dan Brandt, *id.*, Ex. A.) Further, plaintiff provides evidence that defendants' conduct was precisely designed to "eliminate competition during the winter hockey season . . . ." (Cobb Aff. ¶ 6, Docket No. 23; *see also id.* ¶ 8); *see also United Wild Rice*, 313 N.W.2d at 633 (noting that competition is favored in the law so actions that increase competition are not improper). The outside league rule explicitly discourages players from joining plaintiff's leagues by making them ineligible for the District 6 leagues. *See Golden Valley Lutheran Coll.*, 1991 WL 263472, at *3. The rule, therefore, has the intent and purpose of eliminating competition. Further, the wording of the rule and the consequent withdrawal of players from plaintiff's leagues citing the rule are sufficient to demonstrate actual interference. *See Hunt*, 465 N.W.2d at 96. Therefore, on its claim of tortious interference with prospective business relationships, the Court finds that plaintiff has demonstrated a likelihood of success on the merits.

### 2.    Tortious interference with contract

To succeed on a claim of tortious interference with contract, plaintiff must show (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.

*Lisec Am., Inc. v. Wiedmayer*, No. 05-1082, 2005 WL 3143985, at *4 (D. Minn. Nov. 23, 2005) (citing *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 362 (Minn. 1998)).  Defendants assert that any interference is justified due to good faith protection of their own interests in minimizing scheduling conflicts and promoting player well-being.

Plaintiff has provided evidence that defendants knew it had contracts not only with some of District 6's players, but some of its "best" players and coaches.  (*See* Cobb Aff. ¶ 6, Docket No. 23; E-mail from Todd Blackstone, Second McBain Aff., Ex. C, Docket No. 22 (discussing coaches who were "blacklisted" for their involvement with plaintiff).) Evidence of intent is present in the desire to keep plaintiff from "taking" District 6's players.  (Cobb Aff. ¶ 6, Docket No. 23; *see also id.* ¶ 8.)  Damages are the lost revenue from players who have withdrawn from plaintiff's leagues citing the outside league rule. The Court finds implausible the offered justification that District 6 acted to reduce scheduling conflicts and promote player well-being, given that defendants exempted other programs from the rule, (First McBain Aff. ¶ 58, Docket No. 6 (discussing the Joe Dziedzic Hockey exemption)), and did not require players to refrain from any other type of athletic competitions that might cause scheduling conflicts or diminish their physical well-being.  The Court, therefore, finds that plaintiff has demonstrated adequate probability of success on the merits for its claim of tortious interference with contracts.

## V.     Public interest

The public interest factor is balanced.  Plaintiff argues a public interest in anti-competitive behavior.  Defendants argue a public interest in being able to govern amateur

hockey competition effectively under the ASA. Neither of these arguments outweighs the other.

Since a preliminary injunction is a drastic measure and plaintiff's harm is compensable through money damages, the balance of factors weighs slightly in defendants' favor. At the same time, the Court recognizes that the harm to plaintiff is tangible. With the exception of the conspiracy charges, and on the limited record before the Court, plaintiff has demonstrated a likelihood of success on the merits of its federal and state claims. The Court will deny the motion, but finds merit in many of plaintiff's claims.

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Plaintiff Minnesota Made Hockey's Motion for a Preliminary Injunction [Docket No. 3] is **DENIED**.

2.      Defendants' Motion to Strike the Affidavit of Arthur Cobb [Docket No. 26] is **DENIED**.


DATED:  January 4, 2011                    _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                          JOHN R. TUNHEIM
                                                 United States District Judge