## UNITED STATES DISTRICT COURT

## DISTRICT OF MINNESOTA

| | |
|---|---|
| MINNESOTA MADE HOCKEY, INC., | Civil No. 10-3884 (JRT/JJK) |
| Plaintiff, | |
| v. | |
| MINNESOTA HOCKEY, INC.; DISTRICT 6 OF MINNESOTA AMATEUR HOCKEY ASSOCIATION; BLOOMINGTON JEFFERSON HOCKEY BOOSTER CLUB; BLOOMINGTON KENNEDY HOCKEY ASSOCIATION; BLOOMINGTON YOUTH HOCKEY ASSOCIATION; BURNSVILLE HOCKEY CLUB; CHASKA CHANHASSEN HOCKEY ASSOCIATION; EDEN PRAIRIE HOCKEY ASSOCIATION; EDINA HOCKEY ASSOCIATION; MINNETONKA YOUTH HOCKEY ASSOCIATION; NEW PRAGUE HOCKEY ASSOCIATION, INC.; PRIOR LAKE/SAVAGE HOCKEY ASSOCIATION; RICHFIELD HOCKEY AUXILIARY; SHAKOPEE YOUTH HOCKEY ASSOCIATION; WACONIA HOCKEY ASSOCIATION, INC.; BRAD HEWITT; ABC CORPORATION; and JOHN DOE, | **MEMORANDUM OPINION AND ORDER ON DEFENDANTS' MOTIONS TO DISMISS** |
| Defendants. | |

Jason E. Engkjer, Jenna T. Burfeind, and Michael C. Glover, **KALINA WILLS GISVOLD & CLARK, PLLP**, 6160 Summit Drive, Suite 560, Minneapolis, MN 55430, for plaintiff.

Robert L. DeMay, Andrew Davis, and William L. Greene, **LEONARD STREET AND DEINARD, PA,** 150 South Fifth Street, Suite 2300, Minneapolis, MN 55402, for defendants District 6 of Minnesota Amateur Hockey Association, Bloomington Jefferson Hockey Booster Club, Bloomington Kennedy Hockey Association, Bloomington Youth Hockey

Association, Burnsville Hockey Club, Chaska Chanhassen Hockey Association, Eden Prairie Hockey Association, Eden Hockey Association; Minnetonka Youth Hockey Association, New Prague Hockey Association, Richfield Hockey Auxiliary, Shakopee Youth Hockey Association, Waconia Hockey Association and Brad Hewitt.

Janine M. Luhtala, Jonathan C. Marquet, and Mark R. Whitmore, **BASSFORD REMELE, PA**, 33 South Sixth Street, Suite 3800, Minneapolis, MN   55402, for defendant Prior Lake/Savage Hockey Association.

In July 2010, District 6, a division of Minnesota Hockey, Inc. ("Minnesota Hockey") adopted a rule barring its players from participating in another hockey league while playing for a District 6 team.  Plaintiff Minnesota Made Hockey, Inc. ("plaintiff"), which offers league play opportunities to youth who play in the local associations that comprise District 6, brought claims alleging violations of state and federal antitrust laws as well as interference with contracts and business.[1]  Since plaintiff has presented sufficient facts to support its claims that defendants engaged in anticompetitive behavior, the motion to dismiss is denied as to Minnesota Hockey, District 6, and Hewitt. However, since the Court finds that defendants should be considered part of a "unilateral actor," the conspiracy claims fail as a matter of law.  Additionally, since plaintiff does not offer sufficient facts to support the remaining claims against the local associations, the Court dismisses them from the litigation.

---

[1] Minnesota Hockey, District 6, District 6 Director Brad Hewitt, and the local associations organized under District 6 are, collectively, "defendants" in this litigation.

## BACKGROUND

All amateur sports in which the United States competes internationally are organized under a cascading system of regulation.  The head of this system is the United States Olympic Committee ("USOC").  Each sport is governed by a National Governing Body ("NGB").  Congress authorized this structure when it passed the Amateur Sports Act ("ASA") in 1978.  36 U.S.C. §§ 220501, *et seq*.  Congress' purpose for the structure and oversight of amateur sports as governed by the ASA included:

> (1) to establish national goals for amateur athletic activities and encourage the attainment of those goals;
>
> (2) to coordinate and develop amateur athletic activity in the United States, directly related to international amateur athletic competition, to foster productive working relationships among sports-related organizations;
>
> . . .
>
> (6) to promote and encourage physical fitness and public participation in amateur athletic activities;
>
> (7) to assist organizations and persons concerned with sports in the development of amateur athletic programs for amateur athletes . . . .

36 U.S.C. § 220503.

The NGB for each sport must be a non-profit entity that demonstrates "autonom[y] in the governance of its sport . . . ."  36 U.S.C. § 220522(a)(1), (5).  Circuit courts have determined that the autonomy required in the statute allows an NGB "the monolithic control of an amateur sport by the NGB for that sport . . . ."  *Behagen v. Amateur Basketball Ass'n of U.S.*, 884 F.2d 524, 529 (10th Cir. 1989); *see also JES Props., Inc. v. USA Equestrian, Inc.,* 458 F.3d 1224, 1230-31 (11th Cir. 2006), *cert. denied*, 549 U.S.

1205 (2007); *Eleven Line, Inc. v. N. Tex. State Soccer Ass'n, Inc.,* 213 F.3d 198, 204 (5th Cir. 2000).

The NGB for hockey is USA Hockey.  Amateur hockey in Minnesota is controlled by USA Hockey-affiliate Minnesota Hockey.  Minnesota Hockey is further divided into thirteen geographic district associations, of which District 6 is one.  (Aff. of Brad Hewitt ¶ 2, Sept. 27, 2010, Docket No. 16.)  District 6 controls the South and West metro areas of the Twin Cities, and is itself a cooperative group of thirteen local hockey associations. (*Id.*)  Brad Hewitt is the director of District 6.  (*Id.* ¶ 1.)

Plaintiff operates a for-profit hockey program in the same geographic area as District 6.  (First Am. Compl. ¶ 19, Docket No. 31.)  Plaintiff offers a variety of youth hockey programming services including individual training and league and tournament play.  (*Id.* ¶ 22, 26–29.)  Many of the tournaments it hosts and competes in involve teams and players from out-of-state.  (*Id.* ¶ 31.)  Plaintiff owns its own hockey rink in Edina and regularly rents ice time at a rink in Burnsville to conduct this business.  (*Id.* ¶ 19.)  Both rinks are also in the geographic area of District 6.  (*Id.*)  As a result, plaintiff and defendants provide similar services to the same population.  Particularly at issue in this litigation are their league play offerings.

In July 2010, District 6 adopted a rule ("the outside league rule"):

A player registered with [District 6] may not register or play hockey with any other organization, association or team during the winter hockey season, including playoffs.  If a player is found to be registered or playing with another team, the District Director will determine, in their sole discretion, what sanction shall be assessed which may include, without limitation, suspension for the remainder of the District 6 winter hockey season, including playoffs.  This rule does not impact any hockey clinics or

> outside activities including but not limited to Boy Scouts, Girl Scouts,
> Religious events, birthday parties, etc.  This rule strictly applies to league
> play.

(First McBain Aff. ¶ 33, Sept. 10, 2010, Docket No. 6.)  In the minutes of the meeting

during which the outside league rule was discussed and adopted, the agenda item

identifies plaintiff, along with several other private leagues, by name.  (First McBain Aff.

Exs. A–D, Sept. 10, 2010, Docket No. 6.)  Record evidence suggests that the motive for

the rule was to block players from going to other leagues.  (Aff. of Arthur Cobb ¶ 7,

Sept. 30, 2010, Docket No 23 ("Mr. Hewitt discussed concerns regarding the prospective

development of winter hockey season [league play] by [plaintiff].  I recall that Mr. Hewitt

stated that [defendants] ha[ve] to 'stop [plaintiff]' from 'taking our kids' . . . .").)  Several

of the for-profit hockey operations in District 6's area, however, sought and received

exemptions from the outside league rule.  (First McBain Aff. ¶ 58–62, Docket No. 6.)

The local associations that are subordinate to District 6 are charged with informing their

players about the rule and enforcing it but claim no role in the promulgation of the rule.

Several players and coaches have left plaintiff's programs, citing the outside

league rule.  (*Id.* ¶ 47–52, Exs. G–K, Docket No. 6.)  Many of the departing players had

already made substantial deposits for plaintiff's programming.  (*Id.*)  Plaintiff alleges a

loss of approximately forty players.  (Second Aff. of Bernard McBain ¶ 3, Sept. 30, 2010,

Docket No. 22.)

Plaintiff brought claims alleging tortious interference with prospective business

relations; tortious interference with existing contractual relations; violations of Minn.

Stat. §§ 325D.51 & D.52 (Minnesota's antitrust statutes); and violations of 15 U.S.C. §§

1 & 2 (federal antitrust statutes or the "Sherman Act").  Defendants now move for dismissal for failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  In addition to joining the other defendants in the Rule 12(b)(6) motion, the Prior Lake/Savage Hockey Association, one of the thirteen local associations organized under District 6, moves for summary judgment on the ground that it has acted as an agent of District 6, and not independently warranting separate liability.  (Mem. in Supp. at 1, Docket No. 43.)

## ANAYLSIS

## I.    STANDARD OF REVIEW

Reviewing a complaint under a Rule 12(b)(6) motion to dismiss, the Court considers all facts alleged in the complaint as true, and construes the pleadings in a light most favorable to the non-moving party.  *See, e.g.*, *Bhd. of Maint. of Way Emps. v. Burlington N. Santa Fe R.R.*, 270 F.3d 637, 638 (8th Cir. 2001) (per curiam).  To survive a motion to dismiss, however, a complaint must provide more than "'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action . . . .'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).  That is, to avoid dismissal, a complaint must include "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* (internal quotation marks omitted).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Where a complaint pleads facts that

are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility," and, therefore, must be dismissed.  *Id.* (internal quotation marks omitted).  At the motion to dismiss stage, the record for review before the Court is generally limited to the complaint and any documents attached as exhibits that are necessarily embraced by the complaint.  *Porous Media Corp. v. Pall Corp.,* 186 F.3d 1077, 1079 (8th Cir. 1999).

## II.   ANTITRUST CLAIMS

Plaintiff alleges federal and state antitrust violations.[2]  In particular, plaintiff alleges the outside league rule violates both § 1 and § 2 of the Sherman Antitrust Act. The Sherman Act "was intended in the most comprehensive way to provide against combinations or conspiracies in restraint of trade or commerce, the monopolization of trade or commerce, or attempts to monopolize the same."  *D.R. Wilder Mfg. Co. v. Corn Prods. Ref. Co.*, 236 U.S. 165, 173–74 (1915).  Notably, "courts are hesitant to dismiss antitrust actions before the parties have had an opportunity for discovery, because the proof of illegal conduct lies largely in the hands of the alleged antitrust conspirators." *Double D Spotting Serv., Inc. v. Supervalu, Inc.*, 136 F.3d 554, 560 (8th Cir. 1998).

---

[2] Courts have interpreted the Minnesota antitrust statutes as analogous to federal claims. *See, e.g.*, *Howard v. Minn. Timberwolves Basketball Ltd. P'ship*, 636 N.W.2d 551, 557 (Minn. Ct. App. 2001).  As a result, the Court evaluates the motion under the federal statute and imputes the logic to the state claims.  *See Lamminen v. City of Cloquet*, 987 F. Supp. 723, 734 (D. Minn. 1997) ("Minnesota antitrust law is interpreted consistent with the federal court's construction of the Sherman Act.  As discussed . . . above, there is no evidence which supports a reasonable inference of an unlawful conspiracy to restrain trade or to monopolize.  Accordingly, Plaintiff's [state] law claim must fail as well." (citations omitted)).

A.      Exemption from the Sherman Act

As an initial matter, defendants argue they are exempt from antitrust laws for two reasons.  First, they argue exemption given their status as non-profit entities.  It is self-evident that the Sherman Act regulates only transactions that are commercial in nature. *See Klor's, Inc. v. Broadway-Hale Stores, Inc.*, 359 U.S. 207, 213 n.7 (1959) ("[T]he [Sherman] Act is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives.").  Congress, however, intended the Sherman Act to embrace the widest array of conduct possible.  *Goldfarb v. Va. State Bar*, 421 U.S. 773, 788 (1975) ("The nature of an occupation, standing alone, does not provide sanctuary from the Sherman Act, nor is the public-service aspect of [a] practice controlling . . . ." (internal citation omitted)).  As a result, "[t]here is no doubt that the sweeping language of § 1 applies to nonprofit entities . . . ." *NCAA v. Bd. of Regents of the Univ. of Okla.*, 468 U.S. 85, 100 n.22 (1984); *see also Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,* 456 U.S. 556, 576 (1982).  Liability under the Sherman Act is dependent on the particular actions of the non-profit since "the absence of profit is no guarantee that an entity will act in the best interest of consumers." *United States v. Brown Univ.*, 5 F.3d 658, 665 (3[d] Cir. 1993).  Since the defendants here offer services in exchange for money, their actions are commercial and trigger potential liability.  *Id.* at 666 ("The exchange of money for services, even by a nonprofit organization, is a quintessential commercial transaction.").

Therefore the Court finds unavailing defendants' argument for immunity from antitrust law based on their non-profit status.

Second, defendants argue that despite courts consistently concluding that non-profit entities are included in the proscriptions of the Sherman Act, Congress has expressed intent that NGBs have "monolithic" control over their sport.  *See Behagen*, 884 F.2d at 529.  As a result, they argue the ASA confers upon them an exemption from the Act.  The question for a court evaluating implied exemption based on the ASA is "whether the application of the antitrust laws to the facts of this case would unduly interfere with the operation of the ASA."  *Jes Properties, Inc.*, 458 F.3d at 1231 (quotation marks omitted).  The Eleventh, Fifth, and Tenth Circuits have indeed found implied immunity from antitrust law arising from the ASA for the **NGB** of a sport.  *JES Props., Inc.*, 458 F.3d at 1231-32; *Eleven Line, Inc.*, 213 F.3d at 204; *Behagen*, 884 F.2d at 529.  The courts finding such an exemption for the NGB, often in cases addressing individual eligibility rules, have noted that enforcement of the antitrust laws would "threaten the national uniformity Congress envisioned in enacting the ASA."  *Jes Properties, Inc.*, 458 F.3d at 1232.

However, in light of the reluctance to find exemption from antitrust laws absent clear intent, the Fifth Circuit has held that when it is the **state association**, not the NGB, that promulgates a rule, exemption does not necessarily follow.  *Eleven Line, Inc.*, 213 F.3d at 204 ("[I]f the national state associations all over the country had a similar rule, one could infer that the rule was necessary to the management of the sport.").  Here, one

local district of one state affiliate of an NGB has promulgated a rule, "suggest[ing] that the rule is not necessary to the local management of amateur [hockey]." *Id.*

Defendants assert that since the rule is consistent with "pre-existing rules of Minnesota Hockey and with Minnesota High School League Rule 208" the rule should regardless be considered necessary for the local management of the sport. However, even if the rule was actually adopted by the state association, a proposition Minnesota Hockey is apparently considering, exemption still does not necessarily follow; in the only appellate decisions cited by the parties, only the NGB itself was exempted. Further, the rules of the state high school league are not relevant to defendants' liability since the Sherman Act does not apply to state actors. *Parker v. Brown*, 317 U.S. 341, 350–51 (1943) ("We find nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature."). Additionally, a rule promulgated by the high school league presumably is devised not only to manage the sport but also to balance the reality that the players are also students. Minnesota Hockey, in contrast, is only focused on hockey.

The Court finds persuasive the Fifth Circuit's reasoning that no exemption is implied when only one **state** association has adopted a rule, and therefore finds no exemption from antitrust liability when one **district** of a state association has adopted a rule for only their players. *See Eleven Line, Inc.*, 213 F.3d at 204.

**B.      Antitrust standing**

Defendants also argue that plaintiff cannot meet the threshold requirements of the

Sherman Act of antitrust standing.      *See In re Canadian Imp. Antitrust Litig.*, 470 F.3d

785, 791 (8th Cir. 2006) (requiring a showing of both antitrust injury and standing under

antitrust laws).   The Eighth Circuit has articulated a series of factors to determine if a

plaintiff has antitrust standing:

> (1) The causal connection between the alleged antitrust violation and the
> harm to the plaintiff; (2) Improper motive; (3) Whether the injury was of a
> type that Congress sought to redress with the antitrust laws; (4) The
> directness between the injury and the market restraint; (5) The speculative
> nature of the damages; (6) The risk of duplicate recoveries or complex
> damage apportionment.

*Midwest Commc'ns v. Minn. Twins, Inc.*, 779 F.2d 444, 450 n.6 (8th Cir. 1985).

Essentially, the inquiry results in a determination of whether "the plaintiff [is] the target

of the anticompetitive activity, not one who has merely suffered indirect, secondary, or

remote injury."  *Id.* at 451 (internal quotation marks omitted).  Despite the multi-factor

test, an inquiry into the injury "is potentially dispositive: if there is no showing of injury,

. . . the plaintiff does not have a claim cognizable under the antitrust laws." *Id.*  at 450.

In particular, injury "that is an integral part of the conspiracy alleged is the type of injury

that Congress designed the antitrust laws to prevent." *Id.* at 451.

Here, the outside league rule was promulgated with explicit reference to plaintiff,

and plaintiff claims that up to forty players have withdrawn or not registered in its

leagues, many citing the outside league rule as the reason.   Further, plaintiff presents

evidence that the motive behind the rule was to prevent plaintiff from "taking our kids."

The Court finds, at the pleading stage of this case, that this evidence is a sufficient showing of antitrust injury "integral to the conspiracy alleged" and that "the plaintiff [is] the target of the anticompetitive activity" so as to confer antitrust standing.  *Id.* at 450-51.

### C.   15 U.S.C. § 1: Conspiracy

Section 1 of the Sherman Act states that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."  15 U.S.C. § 1.  To prevail on a § 1 claim, plaintiff must initially demonstrate concerted action between two or more legally distinct persons or entities, as opposed to unilateral action.  *Willman v. Heartland Hosp. E.,* 34 F.3d 605, 610 (8th Cir. 1994).  Defendants argue that they should benefit from a "single economic entity" designation as defined by the Supreme Court. Under that analysis

> it is perfectly plain that an internal "agreement" to implement a single, unitary firm's policies does not raise the antitrust dangers that § 1 was designed to police.  The officers of a single firm are not separate economic actors pursuing separate economic interests, so agreements among them do not suddenly bring together economic power that was previously pursuing divergent goals.

*Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984).

"Many  .  .  .  courts have resisted single entity arguments involving sports industries."  *Deutscher Tennis Bund v. ATP Tour, Inc.*, 610 F.3d 820, 836 (3d Cir. 2010); *see id.* at 836 n.14 (listing cases).  However, a review of Minnesota Hockey's by-laws makes clear that each team within a district operates under the direction of the District

Director.  For example, the bylaws allow a district to establish a "district board" but maintain that "if they exist, [they] shall operate as an adjunct part of [the state NGB]." (Minnesota Hockey Handbook at 25, Hewitt Aff. Ex B, Docket No. 16.)  Additionally, the different associations do not "compete" for players for their teams within a district; rather players are assigned based on their residence and can only switch teams through a waiver procedure.  (*Id.* at 27.)  These operating procedures lead the Court to conclude that plaintiff has not asserted sufficient facts to support a conspiracy claim with regards to the local associations; they are more appropriately deemed a "single economic actor" with District 6.  Therefore, the outside league rule is a unilateral action.  *See Eleven Line, Inc.*, 213 F.3d at 206 (holding that the local sports associations were not separate actors from the state association on a conspiracy claim under antitrust law).  This determination warrants the dismissal of the local associations from the antitrust claims.

Plaintiff additionally has not sufficiently plead an antitrust conspiracy claim as between Minnesota Hockey, District 6, and Hewitt.  The pleadings indicate that the outside league rule was promulgated in District 6 by the initiative of Hewitt.  The bylaws of Minnesota Hockey indicate that Hewitt, as a District Director has autonomy in the operation of his District.  (Minnesota Hockey Handbook at 25, Hewitt Aff. Ex B, Docket No. 16 ("It is the responsibility of the District Director to ensure that district administrative matters are handled. . . .  Regardless of how they are performed, the Director retains the responsibility and authority for these duties.").)  However, at the motion hearing, the defendants asserted that Hewitt consulted with Minnesota Hockey regarding the rule.  Minnesota Hockey also is considering promulgating the outside

league rule statewide.   (Am. Compl. ¶ 62–68, Docket No. 31.)   Given the single economic entity analysis of *Copperweld*, however, none of these assertions alter the hierarchical reality of Minnesota Hockey over District 6 over Hewitt.   "A conspiracy requires a plurality of actors, and the issue with related entities is whether they supply the requisite plurality.   *Copperweld* held that no such plurality exists between a corporation and its wholly owned subsidiary corporation." *City of Mt. Pleasant, Iowa v. Associated Elec. Co-op., Inc.*, 838 F.2d 268, 274 (8th Cir. 1988).   The status of defendants as a non-profit organization does not alter the plurality requirement.   As a result, the Court finds plaintiff has not alleged sufficient facts to support the conspiracy claim.   The Court will not address the other elements of a § 1 claim – that the agreement unreasonably restrained trade under either a per se rule of illegality or a rule of reason analysis and that the restraint affected interstate commerce – since plaintiff has not plead sufficient facts to support the existence of a conspiracy for the claim to survive.

### D.      15 U.S.C. § 2: Monopolization

Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."   15 U.S.C. § 2.   Since § 2 does not require concerted action, "one [actor] alone is sufficient . . . ." *Six Twenty-Nine Prods., Inc. v. Rollins Telecasting, Inc.*, 365 F.2d 478, 484 (5th Cir. 1966).   For a monopolization claim, plaintiff must demonstrate that the defendant possessed monopoly power in the

relevant market.  *See Flegel v. Christian Hosp., Ne.-Nw.*, 4 F.3d 682, 691 (8th Cir. 1993).

Monopoly power is the power "to control prices or exclude competition."  *United States*

*v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956).

Plaintiff may establish monopoly power in two ways.  *See Flegel*, 4 F.3d at 691.

First, plaintiff may present direct evidence of monopoly power by "showing the exercise

of actual control over prices or the actual exclusion of competitors."  *Re/Max Int'l, Inc. v.*

*Realty One, Inc.*, 173 F.3d 995, 1018 (6th Cir. 1999) (quoting *Byars v. Bluff City News*

*Co.*, 609 F.2d 843, 850 (6th Cir. 1979)) (internal quotation marks omitted).  Second, a

plaintiff may present "circumstantial evidence of monopoly power by showing a high

market share within a defined market."  *Id.*; *see also HDC Med., Inc. v. Minntech Corp.*,

474 F.3d 543, 547 (8th Cir. 2007).  "In recent years, parties and courts have increasingly

moved toward utilizing the circumstantial method as a 'shortcut.'"  *Realty One*, 173 F.3d

at 1016; *see also Eastman Kodak Co. v. Image Technical Servs.*, *Inc.,* 504 U.S. 451, 464

(1992).

## 1.    **Actual Exclusion of Competitors**

The Supreme Court has endorsed the view that "no elaborate industry analysis is

required to demonstrate the anticompetitive character of [an action]" when that action

"operates as an absolute ban on competit[ion] . . . ."  *Nat. Soc. of Prof'l Eng'rs v. United*

*States*, 435 U.S. 679, 692 (1978).  Given the unique status of defendants as an

organization under the auspices of the USOC, Supreme Court precedent involving similar

sporting entities, such as the National Collegiate Athletic Association ("NCAA"), is

instructive.  The Supreme Court has noted that the NCAA's role "in the regulation of amateur collegiate sports" has rendered it such a powerful player in areas that touch collegiate sports that "the absence of proof of market power does not justify" anticompetitive behavior.  *Bd. of Regents of Univ. of Okla.*, 468 U.S. at 88, 109.

Plaintiff, in the instant case, has provided numerous affidavits of parents who withdrew their children from its programming as a result of the outside league rule. Similar to the facts before the Fifth Circuit in *Eleven Line*, even without actual enforcement of the rule, "the horse was out of the barn" since players and coaches knew of the rule and "were reluctant to . . . jeopardize their standing" with the state association by violating the rule.  *Id.* at 202.  Plaintiff also notes decreased enrollment in its leagues. While this may be attributable to other factors, such as the downturn in the economy, along with the withdrawal of players already registered and who forfeited deposits, these facts allege detrimental effects sufficient to survive a motion to dismiss.

## 2.    Relevant Market and Market Power Test

Evaluating the pleadings under the surrogate test of market power, "plaintiff [must] plead and prove that . . . defendant[s] (1) possessed monopoly power in the relevant market and (2) willfully acquired or maintained that power as opposed to gaining it as a result of a superior product, business acumen, or historical accident."  *Double D Spotting Serv., Inc.*, 136 F.3d at 560 (internal quotation marks omitted).  In assessing a monopolization claim, the Court must first define the relevant market.  *Id.*  "A dismissal on the pleadings should be granted sparingly and with caution . . . [because] often, proper

market definition can be determined only after a factual inquiry into the commercial realities faced by consumers." *Id.* (internal quotation marks omitted)

### a.  Market

"The definition of the relevant market [for an antitrust claim] has two components – a product market and a geographic market." *Bathke v. Casey's Gen. Stores, Inc.*, 64 F.3d 340, 345 (8th Cir. 1995). The determination of the relevant market is a fact driven analysis where "[t]he question is just where these parties met in the [relevant] market." *Crown Zellerbach Corp. v. F.T.C.*, 296 F.2d 800, 804 (9th Cir. 1961). For the purposes of the temporary restraining order, the Court found the relevant product market to be "league play programming." While plaintiff offers a number of services related to youth hockey, the parties' programming overlaps in the area of league play. The evidence of players in both leagues is a "meeting of the parties." Further, given the demands of family and school, youth hockey is also limited in geographic scope by the ability of parents to drive their players to practices and games, thus roughly establishing the geographic market at issue. Therefore, the Court finds that the pleadings allege a relevant market sufficient to state a claim under the Sherman Act.

### b.  Market Power

"Monopoly power is the power to control prices or exclude competition." *United States v. E. I. du Pont de Nemours & Co.*, 351 U.S. 377, 391 (1956). A plaintiff may establish monopoly power by "showing . . . **the actual exclusion of competitors**." *Byars v. Bluff City News Co.*, 609 F.2d 843, 850 (6th Cir. 1979) (emphasis added); *Insignia Sys.,*

*Inc.*, 661 F. Supp. 2d at 1057.  Here, the rule explicitly states that players may not play in outside leagues and players are citing the rule as the reason for their defection from plaintiff's programs. (*See, e.g.*, E-mail from Charlie Pizel, First McBain Aff. Ex. F, Docket No. 6.)  Further, plaintiff asserts that other programs in the area specifically sought and then advertised their exemption from this rule.  These facts sufficiently allege defendants' market power to exclude competition.

### c.    Maintenance of Market Power

The final step of the market power analysis is a showing that defendants have maintained their market power through anticompetitive means as opposed to gaining that power as a result "of a superior product, business acumen, or historical accident." *Double D Spotting Serv., Inc.*, 136 F.3d at 560 (internal quotation marks omitted). "[M]ere possession of monopoly power is not illegal. . . .  However, if a monopolist abuses its monopoly power and acts in an unreasonably exclusionary manner vis-a-vis rivals or potential rivals, then § 2 is violated." *Byars*, 609 F.2d at 850.  The exclusivity requirement of the outside league rule is adequate at this early stage of the case to show anticompetitive means.

In sum, plaintiff has pled sufficient facts to state facially plausible monopolization claims that defendants engaged in anticompetitive behavior under either the actual exclusion or market power test.

### E.      15 U.S.C. § 2: Attempted Monopolization

For a claim of attempted unlawful monopolization, plaintiff must allege "(1) a specific intent by the defendant to control prices or destroy competition; (2) predatory or anticompetitive conduct undertaken by the defendant directed to accomplishing the unlawful purpose; and (3) a dangerous probability of success."  *Gen. Indus. Corp. v. Hartz Mountain Corp.,* 810 F.2d 795, 801 (8th Cir. 1987).  "The specific intent element requires proof that the defendant intended his acts to produce monopoly power;" that is, that the defendant intended "to control prices or to restrain competition unreasonably." *Id.*

Regarding specific intent, plaintiff adequately offers the meeting minutes that specifically reference plaintiff and statements by Hewitt that he wanted to stop plaintiff from "taking" players.  Anticompetitive conduct "is conduct without legitimate business purpose [that] makes sense only because it eliminates competition."  *Trace X Chemical, Inc. v. Canadian Indus., Ltd.*, 738 F.2d 261, 266 (8th Cir. 1984).  As discussed above, the exclusivity requirement of the rule, along with the exemption of certain organizations that arguably would cause similar scheduling and player fatigue in contrast to defendants' proffered purpose for the rule, is adequate at the pleadings state to allege anticompetitive conduct.  Finally, the withdrawal of players from plaintiff's leagues, citing the rule, adequately alleges a dangerous probability of success.  Therefore, the Court finds plaintiff has alleged sufficient facts on the attempted monopolization claims to survive a motion to dismiss.

**F.    TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS RELATIONSHIPS**

Tortious interference with prospective business relationships involves the intentional and improper (1) inducing or otherwise causing a third person not to enter into or continue the prospective relation or (2) preventing the other from acquiring or continuing the prospective relation. *United Wild Rice, Inc. v. Nelson,* 313 N.W.2d 628, 633 (Minn. 1982). Discouraging prospective customers can constitute such interference. *Golden Valley Lutheran Coll. v. City of Golden Valley*, No. CO-91-1189, 1991 WL 263472, at *3 (Minn. Ct. App. Dec. 17, 1991). Plaintiff must establish that the interference actually caused the third person to not enter into the prospective relation. *Hunt v. Univ. of Minn.*, 465 N.W.2d 88, 96 (Minn. Ct. App. 1991).

Here, plaintiff sufficiently alleges interference by Hewitt, District 6, and Minnesota Hockey. Plaintiff asserts that of thirteen players registered in one league, all but one dropped out since the outside league rule was promulgated. (Second McBain Aff. ¶ 4, Sept. 30, 2010, Docket No. 22; *see, e.g.*, E-mail from Dan Brandt, *id.*, Ex. A.) Further, plaintiff provides evidence that defendants' conduct was precisely designed to "eliminate competition during the winter hockey season . . . ." (Cobb Aff. ¶ 6, Docket No. 23; *see also id.* ¶ 8); *see also United Wild Rice*, 313 N.W.2d at 633. The outside league rule explicitly discourages players from joining plaintiff's leagues by making them ineligible for District 6's leagues. *See Golden Valley Lutheran Coll.*, 1991 WL 263472, at *3. Plaintiff has therefore stated a claim that the rule has the intent and purpose of eliminating competition. Further, the wording of the rule and the consequent

withdrawal of players from plaintiff's leagues, citing the rule, support plaintiff's claim of actual interference.  *See Hunt*, 465 N.W.2d at 96.  As a result, the Court finds that plaintiff has pled sufficient facts to state a facially plausible claim of interference with business relations.

### G.    TORTIOUS INTERFERENCE WITH CONTRACT

To succeed on a claim of tortious interference with contract, plaintiff must show (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. *Lisec Am., Inc. v. Wiedmayer*, No. 05-1082, 2005 WL 3143985, at *4 (D. Minn. Nov. 23, 2005) (citing *Kallok v. Medtronic, Inc.,* 573 N.W.2d 356, 362 (Minn. 1998)).

Plaintiff has provided evidence that Minnesota Hockey, District 6, and Hewitt knew it had contracts not only with some of District 6's players, but some of its "best" players and coaches.  (*See* Cobb Aff. ¶ 6, Docket No. 23; E-mail from Todd Blackstone, Second McBain Aff., Ex. C, Docket No. 22 (discussing coaches who were "blacklisted" for their involvement with plaintiff).)  Evidence of intent appears in the desire to keep plaintiff from "taking" District 6's players.  (Cobb Aff. ¶ 6, Docket No. 23; *see also id.* ¶ 8.)  Damages are the lost revenue from players who have withdrawn from plaintiff's leagues citing the outside league rule.  Defendants offer the justification that they acted to reduce scheduling conflicts and promote player well-being.  However, in viewing the facts in a light most favorable to the non-movant, the Court notes that since defendants exempted other programs from the rule, and did not require players to refrain from any

other type of athletic competitions that might cause scheduling conflicts or diminish their physical well-being, plaintiff has pled sufficient facts to state a facially plausible claim.

In sum, the Court finds that plaintiff's pleadings contain sufficient facts for its claims to survive a motion to dismiss, with the exception of the conspiracy claims. The actions and assertions of Hewitt, District 6, and Minnesota Hockey as to who is responsible for the outside league rule make it difficult at the pleadings stage for the Court to determine who is the appropriate defendant on the surviving antitrust claims. Additionally, plaintiff alleges no facts that the local associations have participated in the promulgation or enforcement of the outside league rule other than alerting players to its existence, therefore, the Court finds that dismissal for the local associations is warranted on all claims.[3]

## ORDER

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Defendants' Motion to Dismiss [Docket No. 46] is **GRANTED in part** and **DENIED in part**.

    a.    The motion is **granted** as to Bloomington Jefferson Hockey Booster Club, Bloomington Kennedy Hockey Association, Bloomington Youth Hockey Association; Burnsville Hockey Club, Chaska Chanhassen Hockey Association,

---

[3]    Since Prior Lake/Savage Hockey Association joined the other defendants in the motion to dismiss (*see* Mem. in Supp. at 1, Docket No. 43),, the dismissal of all claims against the local associations makes its separate motion for summary judgment moot.

Eden Prairie Hockey Association, Edina Hockey Association; Minnetonka Youth Hockey Association, New Prague Hockey Association, Inc., Prior Lake/Savage Hockey Association, Richfield Hockey Auxiliary, Shakopee Youth Hockey Association, and Waconia Hockey Association Inc.

b.    The motion is granted as to Count V and the antitrust conspiracy claim  is **dismissed** against all defendants.

c.    The motion is **denied** in all other respects.

2.    Defendant Prior Lake/Savage Hockey Association's Motion for Summary Judgment and/or Dismissal [Docket No. 41] is **DENIED as moot**.


DATED:  May 12, 2011                           _____s/ John R. Tunheim_____
at Minneapolis, Minnesota.                              JOHN R. TUNHEIM
                                                     United States District Judge